Whitehead, J.
This is an action in contract brought by a lender to recover proceeds under the so-called “lender’s provision” of a homeowner’s insurance policy. The case was tried by the Court without a jury on June 30, 1994. The following constitute the Court’s findings of fact, rulings of law and order for judgement.
FINDINGS OF FACT
The plaintiffs, Alan Blackman, Bradley Bartman, Irving Busny, Herbert Hoffman and Paul Stater are partners in Equitable Mortgage Associates, a lending company doing business in Massachusetts. The defendant, the Nationwide Mutual Fire Insurance Company is a corporation engaged in the business of insurance.
As of July 5, 1988, Earl and Linda Lewis were the owners of a property located at 1168 Point Road, Marion. On the property was a five-room ranch house with a two-car garage. There was also a floral business consisting of outbuildings, including greenhouses. The Lewises lived in the house and operated the business.
At all times relevant to this case, up until September 22, 1989, the property on Point Road was covered by a homeowner’s insurance policy issued by Nationwide (Ex. #1).
On July 5, 1988, Equitable received an application from the Lewises for a home-equity loan in the amount of $45,000. On the same day, it undertook an appraisal of the property for the purpose of determining whether such a loan could be adequately secured by a second mortgage to Equitable. The property was, at the time, subject to a first mortgage of $66,813.00 held by the Commonwealth Mortgage Company. Equitable appraised the property at approximately $175,000-$180,000. Based upon all of the evidence, I find that the fair market value of the property on July 5, 1988 was approximately $165,000.
Having received the application and conducted the appraisal, Equitable extended a loan to the Lewises in the amount of $45,000 on or about August 1, 1988. At that time, the Lewises’ homeowners policy was amended to name Equitable as a lender beneficiary. Equitable had no contact with the property itself between July 5, 1988 and September 22, 1989.
By the summer of 1989, the Lewises had become late in their payments on the loan from Equitable, and they were unresponsive to Equitable’s efforts to bring them current. They were in default on the loan. At some point, they also defaulted on the loan from the Commonwealth Mortgage Company.
*481 In early July 1989, Roger Sartini, a boat builder and contractor from Little Compton, Rhode Island, learned from a Paul Stebbene, that the Lewises were interested in selling the Point Road property. He inspected the property soon thereafter and, with Stebbene acting as middleman, reached an agreement to purchase the property. It was Sartini’s intent to occupy the house as his residence and to conduct his boat building business on the property.
On August 1, 1989, Sartini and his wife, as purchasers, and the Lewises, as sellers, executed a written “Real Estate Agreement” (Ex. #12), wherein the Sartinis agreed to purchase the property for the Siam of $250,000. The agreement stated that a deposit had been paid in the amount of $25,000. Evidence other than the agreement itself warranted the inference that consideration over and above the Point Road property was given by the Lewises in exchange for the purchase price and deposit. The precise nature of that consideration was not stated.
Whatever the details of the transaction between the Sartinis and the Lewises were, Sartini did wish to purchase and occupy the property, and he believed that he had an agreement which would bring about that result. On the evidence before me, I cannot reach a conclusion as to whether or not the Lewises in good faith believed that they could and would convey the property to the Sartinis, as agreed, before a foreclosure occurred. Because the burden is on the plaintiff to prove an absence of good faith, I shall presume that the Lewises did believe that they could avoid the foreclosure by selling the property to Sartini first. That being so, I further presume that they did not subjectively intend that Sartini would leave the property in a partially demolished state at the time that any foreclosure did occur.
No closing date was set in the “Real Estate Agreement.” However, from the time of their first communications with Sartini in July 1989, the Lewises informed him that the property was subject to imminent foreclosure and that a prompt closing was necessary. Although the agreement did not so state, Sartini required financing to carry out the purchase. He expected (perhaps unrealistically) that he would be able to obtain financing within approximately three weeks after signing the agreement.
Later in August 1989, while Sartini was awaiting word on financing, he asked the Lewises if he could enter the property and make renovations on the house in anticipation of his moving in. The Lewises assented, indicating at the time that they were in the process of moving out themselves.
At this point, the condition of the property requires extended discussion. On July 5, 1988, Alan Blackman inspected the property on behalf of Equitable. On that day, he found the exterior of the house to be in “fair to good” condition. He found the interior to be in “fair to needs work” condition. He observed that the house needed “paint and paper.” However, appliances and other fixtures were in working condition. The house needed updating.
In the summer of 1989, when Sartini came in contact with the property, he deemed it to be uninhabitable, at least in an aesthetic sense. The kitchen was unusable due to fixtures and appliances that were too filthy for human contact. Rot had spread throughout areas of the room to the point where it required gutting. The bathroom was in a similar condition. Wall-to-wall carpeting which extended throughout the remainder of the house smelled of cat urine. The walls and ceilings in the main hallway and three bedrooms exhibited holes and stress cracks. Wallpaper was peeling off of the walls.
I find that, to some degree, the condition of the house may have deteriorated between the summer of 1988, when Blackman saw it, and the summer of 1989 when Sartini came in contact with it. However, I find that most of the differences between each man’s assessment of the property are accounted for by the fact that Sartini made a more detailed inspection of the property and, as a craftsman and a prospective occupant himself, he viewed it with a more critical eyé. Accordingly, I accept Sartini’s description of the condition of the property and conclude that it was essentially in the same condition in the summer of 1988.
With the express consent of the Lewises, Sartini commenced renovations on the house on September 11, 1989 and worked on those renovations until September 17, 1989. He was assisted by employees from his own business and by relatives. He stripped the kitchen of all appliances and fixtures, and he removed the cabinets. He replaced the sheetrock on the walls and ceiling and put on new paint and wallpaper. New appliances and fixtures were ordered.
Sartini also gutted the bathroom. He removed all carpeting from the floors. He removed wood paneling from the living room walls and replaced it with sheetrock throughout the remainder of the house. He also removed all of the door and window casings in anticipation of putting up new sheetrock. The Lewises witnessed the progress of the work in the course of daily visits, during which they continued to remove items from the property.
In the short time that he worked on the house, Sartini expended $1,945.00 out-of-pocket on labor and materials. Much additional labor was performed free by Sartini and his relatives. The fair market value of all of the work performed was $5,000.00-$7,500.00.
On September 17, 1989, Sartini was informed by Stebbene that Sartini had been denied financing for the purchase of the property. He immediately ceased all work. At that point, he was approximately 35% done with what he intended to do. If the house had been aesthetically uninhabitable when he had begun, it was now functionally uninhabitable. There were no kitchen appliances or fixtures. The bathroom was completely gutted. The hallway and bedrooms remained uncarpeted, and the door and window casings *482 were still off. Additional sheetrocking, painting and papering needed to be done. There was a pile of construction debris in the driveway.
On September 22, 1989, the Commonwealth Mortgage Company conducted a foreclosure auction relative to the properly. Equitable was the high bidder at the auction. It purchased the property for $95,000.00. At some point thereafter, it obtained an appraisal which valued the property at $145,000.00 if restored to “average condition.” (It should be noted that there had been a general decline in real estate values throughout the region during the previous year.)
Equitable ultimately marketed the property and sold it to Buttonwood Trust, an entity which specializes in the construction and rehabilitation of houses. The sale price was $95,000.00. Buttonwood Trust simultaneously acquired a construction loan in the amount of $148,000 from the Rockland Trust Company for the purpose of rehabilitating the property.
As noted above, at the time that Mr. Sartini commenced work on the property it was not a newly rehabilitated house, nor was it even in “average condition.” It was, in fact, in very poor condition. Sartini’s actions rendered it absolutely uninhabitable. Although the evidence on the point is scant, the Court finds that the cost of bringing the property the rest of the way back to the condition in which it was when Sartini commenced his work was $15,000. The basis of such a finding is Sartini’s testimony that he had performed work valued as $5,000-$7,500 on the properly and that he had completed approximately 35% of the work that needed to be done. The Court also finds that $15,000 reflects the reduction in the fair market value of the property resulting from Sartini’s demolition and partial reconstruction.
At the time of trial in this case, the Lewises’ outstanding obligation on the note to Equitable amounted to $45,000 in principal, plus $3,997 in interest, plus late charges.
Rulings of Law
In this case, Equitable as a lender makes its claim against Nationwide under the “standard mortgage” clause of the Lewises’ homeowner’s policy. Where property damage occurs to a home and a claim is made under a “mortgage clause,” of the homeowners policy the lender’s coverage cannot be forfeited even by the intentional actions of the mortgagors/borrowers which result in damage to the property. Gibraltar Financial Corp. v. Lumberman’s Mutual Casualty Co., 400 Mass. 870 (1987). However, coverage under the policy is not triggered at all unless and until there has occurred “property damage” within the meaning of the policy.
The policy itself (Ex. #1, “Definitions”) defines “property damage” as “physical injury to or destruction of tangible property.” In the view of the Court, partial demolition of property, undertaken at the direction of, or with the assent of, an owner whose motive is not malicious and who intends that the demolished portion of the property promptly be rehabilitated, does not constitute “injury to” or “destruction of’ the property.
Clearly, virtually any improvement to property requires that the property undergo some type of temporary alteration which may impede its utility. However, the impediment is transitory and the alteration is seen as a positive event leading naturally to a positive outcome. On the other hand, an “injury” to or “destruction” of property contemplates a negative event necessitating unanticipated remediation to avoid a permanent negative outcome.
Here, the Court has found that Sartini undertook the partial demolition of the premises with the good faith intention of rebuilding and improving the demolished areas. Moreover, the Court is unable to find that the Lewises, who, as owners, permitted the demolition, possessed a different intent.
Accordingly, the Court concludes as a matter of law that the results of the demolition did not constitute “injury to or destruction of’ the property, for which coverage is provided under the terms of the policy.
ORDER
It is hereby ORDERED that judgment enter for the defendant.